PASSAIC COUNTY COURT OF COMMON PLEAS.

JOHN B. PARETTI, PETITIONER-APPELLEE, v. SPOTLESS
CLEANERS & DYERS, RESPONDENT-APPELLANT.

Decided October 3, 1946.

For the petitioner-appellee, *Autenrieth & Wortendyke.*

For the respondent-appellant, *Brett, O'Brien & Brett.*

DELANEY, C. P. J. This matter was tried in the Workmen's Compensation Bureau on October 19th and November 2d, 1945, and January 17th, 1946. The Deputy Commissioner by whom it was heard, in his determination of facts and rule for judgment, dated February 14th, 1946, found in favor of petitioner-appellee (hereinafter called petitioner) and against respondent-appellant (hereinafter referred to as respondent), and allowed petitioner 12-2/7ths weeks, at $20 a week, for temporary disability, and 50 weeks, at the like rate, for permanent disability. From the judgment, entered accordingly, respondent appealed.

It is uncontroverted here, as it became, at length, in the Bureau, that at about 9:15 o'clock on the morning of June 20th, 1944, petitioner suffered accidental injury arising out of and in the course of his employment by respondent, and that respondent had due notice or knowledge of it. "The contest here," declares respondent's brief, "is solely on the question of the nature and extent of permanent disability alleged to be due to the claimed accident," and—somewhat

more broadly—"It is the contention of the respondent that the alleged accident did not bring about any temporary or permanent disability in" petitioner.

Respondent conducts a cleaning and dyeing business, with a laundry department, employing at the time of petitioner's accident 260 or 270 persons. Petitioner, then in his fifty-fifth year, weighing about 250 pounds, and in apparent good health (he had been absent only two days during the twelve years of his employment by respondent, and in twenty-six years had lost no time through illness), worked, in his own words, "as a fancy washer and trouble searcher," with from four to six men (and occasionally none, "according to how we can get help") under his direction. The term "trouble searcher" seems to have covered much ground; he held, at any rate, a position of some importance and responsibility, and when at length it became necessary to replace him, the management was obliged to go outside of its plant to find his successor.

At the time of his accident, petitioner was pushing from the rear, while another employee, walking backwards, was guiding from the front, a steel truck, about five feet in length, thirty or forty inches wide, three feet high, with an eight-inch wheel base, then carrying between 700 and 1,000 pounds of wash, up a cement ramp, the surface of which was broken by hollows. Through a mishap a wheel of the truck slipped into a hollow; and the truck, tilting to petitioner's left, toppled over upon him and pinned him down.

When, without forewarning, the burdened truck stopped short, petitioner "went into"—rammed or struck against, he appears to have meant—its steel railing, a circumstance mentioned by him in describing the accident, but of which he made nothing; and as he was borne down by the tipping truck and the sliding load upon it, the left side of his head "about the ear" struck against a steel cabinet standing nearby.

The capsized truck struck petitioner on his left inguinal region—the groin and lower abdomen—and on his left leg and knee.

Unable to stir, he made an outcry; two employees, whom he named, moved away the truck and wash, and upon extricating him walked with him out into the yard, where he sat

for five or six hours. At about two o'clock in the afternoon he went back into the plant; beyond telling others what to do, he undertook no work; some one or more persons gave him sedatives and bathed his side; at the usual quitting hour the tailor, as seems to have been customary, conveyed him home by car. He went up, not without some difficulty, a short flight of steps leading into his house, had supper, and from the supper table went directly to bed, and stayed abed throughout the two following days.

On arriving at his home, his left side was swollen; a small hernia (a result of an earlier accident, as was conceded, in the same plant; in 1936 he had been struck in the groin by the flying cover of a breaking extractor), scarcely noticeable before, had become plainly distended; the area of his left knee was swollen and red; and he complained of his head.

On the third day respondent's laundry department fell into trouble; the assistant washer had not come in, his wife being very sick; respondent, having no substitute for him, was in a plight. It got word to petitioner of the emergency, and besought him to return to his department. At first he refused, spoke of a difficulty with his leg, and stated that he "could not make it." Respondent's spokesman pressed him to come back, and offered him transportation from the railway station to the plant. In the end petitioner yielded; the promise of transportation was faithfully kept; from that day until the assistant washer reappeared—a period of almost a month—petitioner was met at the depot and was carried in the manager's car to the plant.

Without expressly denying this special transportation service, the manager, who was called by petitioner as a witness, disclaimed, except for one instance on a rainy day, all knowledge of it; but his testimony as a whole is quite unsatisfactory; like the employee under whose guidance a wheel of the truck dropped into a hole in the ramp, he knew much too little about everything concerning which he was asked.

In the unusual circumstances hereinbefore stated, petitioner went back, at the importunity of his employer, to his work, but not to the former scope of it. Thenceforth he oversaw and directed, without otherwise participating in, the

physical work of the laundry. He limped about the plant with the aid of a cane, supervised and bought supplies (the latter apparently by telephone or mail); a forelady supplied salve for his leg; he took simple remedies at hand for continuous or daily headache. At least twice at the point of quitting, he perseveringly filled the breach until the assistant washer came back, and then immediately left.

In the intervening month his hernia became more and more formidable and troublesome; it progressively grew from the size of a coin to the proportions of a "grapefruit" or larger; and descending, lay in a kind of sac. On the following day after terminating his employment, he was taken to a Veterans' Hospital in the Bronx, New York, for an operation; recited the history of his hernia to the girl in charge of the admission of patients, went back home for three or four days, and then entered the hospital (July, 1944). He was put to bed there, examined every day, given medicine for headache, as he supposed, after each meal, operated on for hernia on September 12th, and a hydrocele developing three or four days later— said by the doctors to be not uncommon after a hernia operation—was operated again for that, and was discharged on October 25th, with a caution against the resumption of work. On June 20th of the following summer (1945) he entered, at the instance of the Veterans' Hospital in the Bronx (as we understand it), the Navy Hospital at St. Albans, Long Island, for leg and "head trouble," and stayed there until July 25th.

Since July, 1944, he has performed no work, and at the times of his examination by the doctors who testified in the Bureau, was admittedly incapable of any.

In testifying in the Bureau (November 2d, 1945), he complained of pain in his left side and in his head behind the left ear, in his back, in his leg and knee where the truck had struck him, of headache, of dizziness, of inability to stand long or to sleep on his left side, of impairment of sight and hearing—all symptoms appearing since his accident and, rightly or wrongly, attributed by him to it. There is no reason to question his statement that the outstanding thing which led to his withdrawal from his employment was the

pronounced aggravation of a hernia, from which he had previously suffered no inconvenience, and the resulting interference with his getting about. He said that while in the Veterans' Hospital in the Bronx he continually complained of his head and side, and that when he arose from his bed in the ward before the first surgery he walked about with a borrowed cane. Of these complaints in the hospital, of his use of a cane there, there is no contradiction.

The brief filed for respondent insistently assails petitioner's testimony *argumentatively;* but the inescapable fact is that his story was unrefuted and unshaken and, except in a lonely instance, undenied. That instance is of no importance here, except as it might draw his trustworthiness as a witness in question. The manager testified that after petitioner went to the hospital, he first heard that "he claimed he got hurt on the job. How, what, and when, I don't know." Petitioner said, in the course of the first four weeks after his accident he talked with the manager "a dozen times" about it.

It strains credulity to suppose that the suddenly restricted range, continued through four successive weeks, of the work of an old-time employee, who was known to the manager during the whole course of a twelve-year employment—the head of an important and "one-man department, that special department," as the manager styled it—completely escaped the manager's notice, or that the employee's limping entrance into the office "five or six times a day," with the manager usually present, passed altogether unobserved; or for that matter that upon the manager's belatedly hearing, after the post was vacant and its occupant in a hospital, that the latter should have been so singularly incurious as to have set afoot no inquiry about it.

At the end of the hearings in the Bureau, with the evidence in respect to the statutory notice or knowledge in this posture—petitioner affirming, the manager denying, it—counsel for respondent limited the issues to "the question of disability flowing" from the accident. We are obliged to reject the testimony of the manager.

Respondent argues that the conduct of petitioner is inconsistent with his testimony in that, while now ascribing the

whole body of his infirmities to the accident, he asked the management for no medical attention during the four weeks in which he continued in its employ, and sought out no physician until his admission into the hospital. What he knew at the time of the rights of an employee, injured in his employment, does not appear; it may be assumed that his hospitalization in the Veterans' and Navy hospitals cost him nothing (no bills were presented in the Bureau); and when discharged he applied for help in the first instance, not to respondent, but to a labor union into whose treasury he had paid dues for years. Nothing in the record suggesting the contrary, it may be assumed that he received the same wages after the accident as before it; and he could not have foreseen, during the last month of his employment, that he was not soon, or ever, to be restored to his former activity and usefulness. We find little force in the argument.

Respondent dwells also upon the fact—the readily admitted fact—that to the doctors in the Veterans' Hospital petitioner said nothing about his accident. "When I went," he said, "I told them I needed medical attention and needed an operation, and they checked up on me. * * * They weren't interested in what accidents I had. They didn't ask me anything. I told them I had a hernia and needed an operation." And again, "You can't complain when you go in there. The doctor examines you and puts you where you belong." With the staffs of veterans' hospitals reputedly overworked and undermanned, there may be insight and truth in these observations. At any rate, as already stated, he gave a history of his hernia to the young woman in the hospital office; and he told the "contact man * * * the government man who goes around to see that every soldier gets an order for anything he needs"—about his accident.

That he was hurt by it is so clear as to render needless further discussion about it; an unbroken sequence of incidents, all undenied (and many of them susceptible of refutation, if untrue) asserts it—his sitting out in the open air for hours right after the metal truck struck him down, the aggravation in his hernia and the physical evidences of injury disclosed at home at a later hour of the same day, his staying

in bed during the next two days (increasing to four the number of working days lost in twelve years, unless June 21st and 22d were the two lost days to which he referred), his altered life in the plant henceforth (altogether undenied), his quitting work simultaneously with the coming in of the assistant washer, his appearance in a hospital on the very next day, his prompt entry into it, his operation and the nature of his complaints there, his admission into another hospital for leg and head "trouble" in the following summer and his whole after history.

The real question is not whether the accident resulted in injury, but to what extent, if any, his permanent disability is the consequence of it. We turn to the testimony of the doctors for the answers.

Dr. Edward W. Markens and Dr. M. W. Bergman testified for petitioner. They examined him on January 3d, 1945, and March 19th, 1945, respectively. The same number of physicians were sworn for respondent—Dr. William K. Harryman and Dr. Morris Grossman, Dr. Harryman having made his examinations of petitioner on March 21st, 1945, and October 29th, 1945, and Dr. Grossman on October 19th, 1945.

Dr. Markens testified that petitioner complained to him of pain in the left side of his neck and head, in his left leg and in his back. The doctor found a pressure tenderness and a myositis over the left lumbar region and the lower dorsal, some swelling in the left knee, slight restriction of full extension of the left leg at the knee, and a restriction of about fifteen degrees of flexion of the leg toward the thigh, and attributed them all to the accident in question. He said that the myositis in the back is due to a spinal anesthesia received by petitioner at the time of his operation, and declared that it is not an uncommon condition after such an injection—a statement which, if not accepted by the other three experts, was unchallenged by any of them. He found 20% disability in the left leg, 7-½% in the back, and from 10% to 15% of total. His examination was not neurological, and he did not determine petitioner's blood pressure—facts now noted for reasons presently to appear.

Dr. Bergman, a neurologist, said that petitioner complained

to him of pain in his left leg, arm and shoulder, of headaches, of a tightening and trembling of the muscles on the left side of his body, of labor in walking, of insomnia, of nervousness and of impairment in sight. The physician found a hypertrophy of the heart, high blood pressure, a limp in his walk, a limitation of motion of the left lower thigh, tremulousness in the extended fingers, increased sensitivity in the traumatized area, tenderness in the suboccipital area of the skull, a traumatic myositis of the left upper side of the neck, tenderness in the anterior upper left chest, and found the man also to be anxious and hyperemotional. When asked whether in his judgment petitioner was suffering from any neurological disability resulting from the accident, he replied in the affirmative, and said that he attributed "7-½% of total, *exclusive of the orthopedic,* as related to the trauma he sustained." He added that "physiologically" petitioner "has a large percentage of disability and one would expect that neuropsychiatrically he had much greater than 7-½% of total. I have tried to reasonably estimate and evaluate that arising purely from the trauma." He declared that the theory that petitioner's high blood pressure was a "sequelli of the accident" is not untenable, but rejected it, and assumed that "some systemic condition" caused it. He declared that the neurosis "will intensify it periodically but not give it a permanent damage," and excluded from his estimate of disability all disability flowing from hypertension; "The same is for his glandular condition and the orthopedic finding." He testified that petitioner "states that ever since the accident he has been a changed man and he focuses, he crystalizes, it on to the accident. That is the greater part of the figure of 7-½% of total which is the neurosis related to trauma, although he conscientiously believes he has much more disability; but I, as a physician experienced in estimating disabilities, allocate that which I feel is the greater measure of it." He was questioned, on cross-examination, as to when "the fixation of these complaints associated with" the accident would first appear; and he replied that the time is variable; "In some people it might come any time. But I reasonably believe that it should come within a month or two or during the period of treat-

ment. As far as headaches are concerned or dizziness or any symptom referable to concussion, they should come reasonably within a short time after." As already stated, the headaches, at least, closely followed the accident.

Dr. Harryman found petitioner to be a hundred per cent. disabled in so far as any "active work" is concerned; but attributed the whole of his disability to elevated blood pressure and chronic myocarditis. He said that petitioner complained to him of pain on the left side of his head and in his left shoulder and of tenderness about the left knee; and he found, in fact, "some slight local induration in" the latter area, but no functional loss. At the second examination, petitioner still complained of his left knee, but in a slightly different locality. Notwithstanding that the doctor said at one point in his testimony that he found the man's disability to be due to his constitutional condition, and not at all to his accident, he declared at another point: "How much of his condition is due to the so-called accident is rather hard to estimate;" and again at a third point: "If he hurt his left knee and he struck the left side of his head and shoulder, then it is possible that the symptoms arising from that may be attributable to the accident." We conclude that his testimony was too theoretical and speculative and vacillating to be very helpful either to the one party or to the other. He found it hard to determine whether the hernia was due to the accident, although the hernia admittedly long preceded it; and assumed that petitioner entered the first hospital "primarily because he was short of breath"—an assumption which, so far as the record discloses, has not the most shadowy basis in fact.

Dr. Grossman found high blood pressure and heart murmurs and some hardening of the peripheral vessels of the body, and a tenderness to percussion of the left occipital region of the skull, and concluded that petitioner is suffering from "a neurosis and a hypertension," and estimated his permanent disability from the neurosis to be $2\frac{1}{2}\%$ of total. But he testified: "* * * it would be almost impossible to differentiate how much of his neurosis is due to his hypertension and how much is due to the possible injury he

sustained," and he thought petitioner's high blood pressure contributed to his neurosis. It is reasonably probable, he readily conceded, that the accident caused the neurosis; and testified that any accident, mental or physical, may be the underlying cause of neurosis, and that it frequently is.

The record exhibits a familiar variance of professional opinion, but establishes the fact that the accident sent this employee from a laundry room to a hospital bed. It may be assumed, although the evidence leaves the actual fact undetermined, that petitioner's high blood pressure or his heart condition (whatever the latter may be), or both, antedated his accident; but the proof is that, before the accident, neither the one nor the other, nor the conjunction of both, ever occasioned an interruption in petitioner's work, or diminished its volume or restricted its scope. The curtailment in the range of his work, its eventual total cessation, the rise of his neurosis all came in the train of the accident. We find that the weight of the medical testimony is in favor of the petitioner.

The Deputy Commissioner determined that petitioner suffered permanent disability, as a consequence of the accident, in his leg and back, and attributed his neurosis altogether to the accident. Whether the neurosis is due solely to the accident, as well may be, or only in part, the award to the petitioner made in the Bureau we find to have been not only justified by the preponderance of the evidence, but safely conservative also.

The judgment appealed from will be affirmed.